ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VIII

| JOINT CONCESSION MANAGEMENT LLC.; TROPIGAS DE PUERTO RICO, INC.; PUMA ENERGY CARIBE LLC.; PETROLEUM PRODUCTS SUPPLY LLC.; BEST PETROLEUM CORP.; TOTALENERGIES MARKETING PUERTO RICO, CORP.<br><br>Parte Recurrente<br><br>v.<br><br>COMISIÓN DE PRACTICAJE DE PUERTO RICO<br><br>Parte Recurrida | KLRA202300433 | *Revisión Judicial,* procedente de la Comisión de Practicaje de Puerto Rico<br><br>Caso Núm.:<br>Recurso de Revisión de Enmienda mediante Resolución al Reglamento 7214, Titulado "Reglas de Tránsito en los Puertos de Puerto Rico de 2006"<br><br>Sobre:<br>Nulidad de Enmienda a Reglamento |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Monge Gómez, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 29 de septiembre de 2023.

Compareció ante este Tribunal la parte recurrente, Joint Concession Management LLC, Tropigas de Puerto Rico, Inc., Puma Energy Caribe LLC, Petroleum Products Supply LLC, Best Petroleum, Corp. y TotalEnergies Marketing Puerto Rico, Corp. (en adelante, los "Recurrentes"), mediante el recurso de revisión judicial de epígrafe. Nos solicitaron la revisión y declaración de nulidad de lo que, a su juicio, constituyó una enmienda al Reglamento Núm. 7214 de 31 de agosto de 2006 de la Comisión de Practicaje de Puerto Rico, conocido como las "Reglas de Tránsito en los Puertos de Puerto Rico de 2006" (en adelante, "Reglamento Núm. 7214"), mediante la adopción de las *LNG Vessel Safety Guidelines*, sin cumplir con el procedimiento formal de aprobación de reglamentos en nuestra jurisdicción.

Por los fundamentos que expondremos a continuación, se decreta la nulidad de las *LNG Vessel Safety Guidelines* aprobadas por la Comisión de Practicaje de Puerto Rico, por entender que constituyen una enmienda al Reglamento Núm. 7214, *supra*, sin que se hubieran adoptado conforme el proceso de reglamentación formal dispuesto en la Ley Núm. 38-2017, según enmendada, conocida como la "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico", 3 LPRA secs. 9601 *et seq.* Veamos.

## I.

El caso de epígrafe tuvo su génesis el 31 de agosto de 2020, cuando San Juan Bay Pilot (en adelante, "SJBP"), corporación compuesta por pilotos que prestan servicios de practicaje para barcos que atracan o salen del muelle de *Cataño Oil Dock* (en adelante, "COD"), presentó ante la Comisión los *LNG Vessel Safety Guidelines* (en adelante, "las guías de seguridad"). Ello, a raíz de unas enmiendas realizadas al 33 CFR 165.754, debido a la construcción y operación de cierta infraestructura requerida para descargar y transferir gas natural licuado (por sus siglas en inglés, "LNG") en el *Army Terminal Turning Basin*, localizado en la Bahía de San Juan.

Así pues, las guías de seguridad, en lo pertinente a las embarcaciones en el lado este del COD, disponen lo siguiente:

- Vessel can dock at COD E and not to exceed a 22m beam if there is only one Bessel ay Puerto Nuevo A&B.
- LNG vessel can dock side by side (lightering operation) after the vessel at COD E is safely moored.
- No Vessel Movement at COD E while two vessels are docked side by side at Puerto Nuevo A&B.
- No vessel can dock at COD E while two vessels are docked side by side at Puerto Nuevo A&B. [1]

El 24 de noviembre de 2021, luego de realizar una serie de simulaciones, la SJBP presentó unas recomendaciones a las guías de seguridad por un periodo probatorio. Sostuvieron que, presuntamente, el inicio de la operación del *New Fortress Energy* en los muelles de Puerto Nuevo A/B parece haber creado un conflicto con respecto al tamaño de las

---

[1] *Véase*, LNG vessel Safety Guidelines, Ap. pág. 003.

embarcaciones que pueden maniobrar con seguridad en el área adyacente al COD Este.[2] Ello pues, tanto la carga del gas natural licuado y el gas licuado de petróleo, requieren consideraciones especiales y precauciones de seguridad mejoradas.

A esos efectos, las recomendaciones fueron las siguientes:

**Option A** (Best and safest): Open up the space in order to maneuver alongside COD-E by shifting the LNG Tanker at Puerto Nuevo A/B by at least 40 meters.
**Option B:** Considering the beam of the current tanker berthed at New Fortress Terminal PN A/B (Ineos Independence) the following guidelines would scale down the risk to an acceptable level.
- Max LOA 164m (as per TOTAL Vessel configuration table for COD E/W dated (10/09/19)
- Max Beam 32.2m
- Vessels with a beam of more than 22.0m:
    o Day time Only
    o 2 Pilots
    o PPU unit (Portable Pilot Units)
    o Tug assisted berthing and unberthing with 3 tractor tugs
    o Wind less than 15 KTS
- Vessels less than 22m beam:
    o Tug assisted berthing and unberthing with 2 tractor tugs.[3]

En vista de que los Recurrentes tienen operaciones en el COD, en donde atracan embarcaciones y tanqueros para descargar gasolina diésel, gas propano, asfalto y otros productos derivados de petróleo que éstos importan, y debido a que las referidas guías tuvieron un efecto directo sobre dichas operaciones, presentaron una "**Querella**" el 22 de marzo de 2022 ante la Comisión de Practicaje de Puerto Rico (en adelante, la "Comisión" o la "Recurrida") en contra de SJBP y su presidente al momento de los hechos.[4] Solicitaron que se expidiera una orden de cese y desista provisional y otra permanente para dejar sin efecto las guías de seguridad, así como sus enmiendas y su implementación por parte de los prácticos.[5] El 1 de agosto de 2022, SJBP presentó una "**Moción Solicitando Paralización Temporera de los Procedimientos**" en la que peticionó que

---

[2] *Véase*, Misiva dirigida a la Comisión por SJBP el 24 de noviembre de 2021, Ap. pág. 006; traducción nuestra.
[3] Véase, Misiva dirigida a la Comisión por SJBP el 24 de noviembre de 2021, Ap. pág. 006.
[4] *Véase*, "**Querella**" CPPR Q2022-001, Ap. págs. 009-023.
[5] La Ley Núm. 226-1999, en su Artículo 2, define práctico como "la persona experimentada, versada y diestra que, a través de la práctica, adquiere el conocimiento del lugar en que navega cualificándolo para dirigir y dirige a vista el rumbo de las embarcaciones, llamándose de costa o de puerto, respectivamente, según sea en una u otro donde ejerce su profesión". 23 LPRA sec. 361.

se paralizaran los procedimientos administrativos ante la Comisión hasta tanto se llevaran a cabo diez (10) manobras en las cuales fueran relevantes las guías de seguridad.

Mediante *Resolución Interlocutoria y Orden* de 25 de octubre de 2022, la Comisión ordenó la paralización solicitada por SJBP y le concedió un término de catorce (14) días para que llevara a cabo las diez (10) maniobras, utilizando las guías de seguridad impugnadas y para que notificaran su posición en cuanto a la necesidad de adoptar permanentemente o no las mismas. Ello en consideración a que, de esa forma, los pilotos tendrían la oportunidad de validar y corroborar la aplicación de dichas guías a las maniobras reales, en las circunstancias en las que se requiera la aplicación de éstas. Así las cosas, SJBP y su presidente presentaron "**Moción en Cumplimiento de Orden**" e informaron que concluidas las maniobras antes mencionadas y a base de la experiencia adquirida, enmendaron las guías de seguridad nuevamente y solicitaron que fueran adoptadas por la Comisión de forma permanente para las operaciones futuras en las circunstancias descritas en las propias guías. De conformidad con ello, las guías enmendadas disponían lo siguiente:

> Considerando la manga del buque tanque actual atracado en New Fortress Terminal PN A/B (Ineos Independence/Coral Encanto), las siguientes medidas reducirán el riesgo a un nivel aceptable:
>
> LOA máximo según tabla de configuración TOTAL de embarcaciones para COD E/O del 2 diciembre de 2021 - Manga máxima de 32,2m.
>
> -Embarcaciones con una manga de más de 22,0m:
> - Sólo durante el día
> - 2 pilotos
> - Unidad PPU (Unidades Piloto Portátiles)
> - Atraque y desatraque para remolcar con 2 remolcadores tractores
> - Viento – discreción del piloto
>
> -Embarcaciones de menos de 22m de manga:
> - Atraque y desatraque asistido por remolcador con 2 remolcadores tractores.
>
> -Embarcaciones Side by Side (transferencia)

- Un ASD/remolcador de tractor con modo de espera cuando una embarcación de más de 450 pies (137m) está transitando por el Army terminal turning basin.[6]

El 18 de julio de 2023, la Comisión remitió una misiva y notificó a los usuarios de Puerto Nuevo A y B, y del COD, que las antes mencionadas guías de seguridad habían sido adoptadas.[7] No obstante, y en consideración a dichas enmiendas, la Comisión dictó *Orden* mediante la cual le concedió un término a los Recurrentes para que mostraran causa por la cual no debía desestimar el caso por haberse tornado académico, toda vez que las guías de seguridad habían sido enmendadas sustancialmente.

En cumplimiento con dicho dictamen, comparecieron los Recurrentes mediante "**Moción en Cumplimiento de Orden y Solicitando Autorización para presentar Querella Enmendada**". Allí plantearon que la controversia no se había tornado académica, puesto a que aún no estaban de acuerdo con las enmiendas realizadas a las guías de seguridad, por lo que solicitaron un término adicional para enmendar la "**Querella**". Específicamente, aludieron a que no estaban de acuerdo con la inclusión de dos (2) pilotos para proveer el servicio y que el límite de vientos de un máximo de 25 mph era inadecuado. No empece a dicha solicitud, la Comisión emitió *Resolución* el 31 de julio de 2023. Mediante la misma, expresó que las enmiendas a las guías de seguridad sometidas por SJBP habían sido aprobadas el 27 de abril de 2023 y notificadas mediante aviso de 21 de julio de 2023. Añadió que la adopción de dichas guías obedeció

---

[6] *Véase*, Aviso dirigido a los usuarios de los muelles Puerto Nuevo A/B y Cataño Oil Dock por la Comisión el 18 de julio de 2023, Ap. pág. 002.
Considering the beam of the current tanker berthed at New Fortress Terminal PN A/B (Ineos Independence/Coral Encanto) the following guidelines would scale down the risk to an acceptable level.
- Max LOA as per TOTAL Vessel configuration table for COD E/W dated December 2, 2021 - Max Beam 32.2m
- Vessels with a beam of more than 22.0m:
  o Daytime Only
  o 2 Pilots
  o PPU unit (Portable Pilot Units)
  o Tug assisted berthing and unberthing with 2 tractor tugs
  o Wind – pilot discretion
- Vessels less than 22m beam:
  o Tug assisted berthing and unberthing with 2 tractor tugs.
- Side by Side vessels (lightering)
  o An ASD/tractor tug on standby when a vessel larger than 450' (137m) is transiting Army terminal turning basin.
[7] *Véase*, Aviso emitido por la Comisión el 18 de julio de 2023, Ap. pág. 002.

a la necesidad de garantizar la seguridad en los muelles Puerto Nuevo A/B y COD Este, ello debido al espacio reducido entre los terminales y a la naturaleza de las cargas que se manejan en ambos (gas licuado de petróleo y gas natural licuado). Sostuvo que "[e]l manejo de estas cargas requiere consideraciones especiales y precauciones de seguridad actualizadas, consideraciones que esta Comisión entendió razonables atender adoptando las nuevas medidas de seguridad recomendadas por la SJBP el 9 de marzo de 2023".[8]

En consecuencia, entendió la Comisión que la "**Querella**" se había tornado académica, por lo que la declaró No Ha Lugar y ordenó el archivo de la misma.[9] Determinó que no procedía la solicitud de cese y desista contra SJBP, ya que las guías de seguridad en las cuales estaba basada la "**Querella**" habían sido sustancialmente enmendadas y adoptadas por la Comisión el 27 de abril de 2023.

Inconforme con tal determinación, el 17 de agosto de 2023, los Recurrentes presentaron ante nuestra consideración el recurso de revisión judicial que nos ocupa. Mediante el mismo, le imputaron a la Comisión haber cometido los siguientes errores:

> 1. La Comisión no publicó un aviso que cumpliera con los requisitos de notificación de propuesta de adopción de reglamentación esbozados en la Sección 2.1 de la LPAU, 3 L.P.R.A. § 9611;
>
> 2. La Comisión no proveyó oportunidad a la ciudadanía para someter comentarios por escrito durante un término no mayor de treinta (30) días, contados a partir de la fecha de la publicación del aviso según exige la Sección 2.1 de la LPAU, 3 L.P.R.A. § 9612;
>
> 3. La Comisión no celebró vistas públicas según requiere la Sección 2.3 de la LPAU, 3 L.P.R.A. § 9613, y el Artículo 21(b) de la Ley 226, su ley habilitadora;
>
> 4. La Comisión no presentó la enmienda al Reglamento en el Departamento de Estado según requiere la Sección 2.8 de la LPAU, 3 L.P.R.A. § 9612, y por tal razón
>
> 5. El Departamento de Estado no público en dos (2) periódicos de circulación general una síntesis del contenido de la enmienda al Reglamento, con expresión

---

[8] *Véase*, Apéndice del recurso de revisión judicial, pág. 032.
[9] El último trámite procesal que surge de la *Resolución* y del expediente ante nuestra consideración fue la "**Moción en Cumplimiento de Orden y Solicitando Autorización para Presentar Querella Enmendada**", Ap. pág. 029.

de su número, fecha de vigencia y agencia que lo aprobó como también exige la Sección 2.8 de la LPAU.

El 15 de septiembre de 2023, la Comisión presentó su "**Oposición a Recurso de Impugnación de Reglamento**".

Con el beneficio de la comparecencia de las partes procedemos a resolver.

**II.**

**A.**

La Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, 3 LPRA sec. 9601 *et seq.* (en adelante, "LPAU" o "Ley Núm. 38-2017"), se creó a los fines de uniformar los procedimientos administrativos ante las agencias. Consecuentemente, desde la aprobación del procedimiento provisto por la LPAU, los entes administrativos están precisados a conducir sus procesos de reglamentación, adjudicación y concesión de licencias y permisos de conformidad con los preceptos de este estatuto y el debido proceso de ley. López Rivera v. Adm. de Corrección, 174 DPR 247, 254-255 (2008). En específico, la Ley Núm. 38-2017, *supra*, estableció unas reglas mínimas al proceso de reglamentación a aquellas agencias cuya ley orgánica les confiera dicho poder. Dicho estatuto dispone que el término "agencia" incluye las corporaciones públicas que hayan sido autorizadas por ley a llevar a cabo funciones de reglamentación. 3 LPRA sec. 9603 (a).

Es norma reiterada en nuestro ordenamiento jurídico que, al momento de aprobar, enmendar o derogar un reglamento, la LPAU les exige a las agencias administrativas el cumplimiento de los siguientes requisitos:

> (1) notificar al público la reglamentación que ha de aprobarse; (2) proveer oportunidad para la participación ciudadana, incluyendo vistas públicas cuando sea necesario u obligatorio; (3) presentar la reglamentación ante el Departamento de Estado para la aprobación correspondiente, y (4) publicar la reglamentación aprobada. FCPR v. ELA *et al.*, 2023 TSPR 26, 211 DPR ___ (2023); Mun. de Toa Baja v. D.R.N.A., 185 DPR 684, 694 (2012); 3 LPRA sec. 9611–9613, 9618 y 9621.

La referida ley define lo que constituye una regla o reglamento como:

[C]ualquier norma o conjunto de normas de una agencia que sea de aplicación general que ejecute o interprete la política pública o la ley, o **que regule los requisitos de los procedimientos o prácticas de una agencia que tenga fuerza de ley**. El término incluye la enmienda, revocación o suspensión de una regla existente. 3 LPRA sec. 9603(m) (énfasis suplido).

Cabe destacar que la propia LPAU expresamente excluye de esta definición, entre otros, los documentos guías. Íd. La Sección 1.3 (c) define documento guía como sigue:

[U]n documento físico o electrónico de aplicabilidad general desarrollado por una agencia, que carece de fuerza de ley[,] pero expresa la interpretación de la agencia sobre alguna legislación, la política pública de la agencia o que describe cómo y cuándo la agencia ejercerá sus funciones discrecionales. Incluye interpretaciones oficiales, según definidas en esta Ley. 3 LPRA sec. 9603(c).

Por otro lado, nuestro Tribunal Supremo distingue entre las reglas no legislativas o reglas legislativas que las agencias administrativas pueden formular. Las primeras están exentas de cumplir con el procedimiento formal de reglamentación, pues "constituyen pronunciamientos administrativos que no alteran los derechos ni las obligaciones de los individuos". Sierra Club *et al.* v. Jta. de Planificación, 203 DPR 596, 605 (2019). No obstante, debido a que las reglas legislativas sí crean derechos, imponen obligaciones y establecen un patrón de conducta que tienen fuerza de ley, requieren el cumplimiento del procedimiento de reglamentación establecido por la Ley Núm. 38-2017, *supra*. Ello, por su importancia y el efecto que pueden acarrear para el público general. Íd. Dicho procedimiento "**es indispensable para poder reconocerle fuerza de ley a la regla promulgada**, ya que ello forma parte de las garantías procesales que permean todo el estatuto". Íd., pág. 606 (citando a Centro Unido Detallista v. Com. Serv. Púb., 174 DPR 174, 183 (2008)) (énfasis suplido). De modo que, una regla legislativa que no cumpla con los requisitos procesales que impone la LPAU, *supra,* sobre la reglamentación formal, se entenderá nula. 3 LPRA sec. 9617.

De entrada, la Sección 2.1 de la Ley Núm. 38-2017, *supra*, establece que "[s]iempre que la agencia pretenda adoptar, enmendar o derogar una regla o reglamento, publicará un aviso en español y en inglés en no menos

de un periódico de circulación general en Puerto Rico, y en español e inglés en la red de internet". 3 LPRA sec. 9611. Este aviso contendrá:

> [U]n resumen o explicación breve de los propósitos de la propuesta acción, una cita de la adopción legal que autoriza dicha acción y la forma, el sitio, los días y las horas en que se podrán someter comentarios por escrito o por correo electrónico o solicitar por escrito una vista oral sobre la propuesta acción con los fundamentos que a juicio del solicitante hagan necesaria la concesión de dicha vista oral e indicará el lugar físico y la dirección electrónica donde estará disponible al público, el texto completo de la reglamentación a adoptarse. Al recibir comentarios por correo electrónico, la agencia acusará recibo de los mismos por correo electrónico dentro de dos (2) días laborables de su recibo. El aviso publicado en el periódico contendrá, además, la dirección electrónica de la página donde la agencia haya elegido publicar el aviso en la Red y el texto completo de la regla o reglamento. Íd.

En cuanto a la participación ciudadana, el referido estatuto dispone que "[l]a agencia proveerá oportunidad para someter comentarios por escrito durante un término no menor de treinta (30) días, contados a partir de la fecha de la publicación del aviso". 3 LPRA sec. 9612.  Sin embargo, la celebración de una vista pública estará sujeta a que la ley orgánica o ley aplicable la haga mandatoria o a discreción de la agencia. 3 LPRA sec. 9613. El Tribunal Supremo también ha reconocido que:

> Es imperativo que la agencia también mantenga un expediente disponible al público con todo lo relativo al procedimiento de adopción, enmienda o derogación de la regla o reglamento en cuestión, […] pues la participación ciudadana trae ante la consideración de la agencia perspectivas distintas sobre el alcance y la aplicación de las reglas que pretende aprobar. Grupo HIMA v. Dept. de Salud, 181 DPR 72, 78 (2011) (citas omitidas).

Culminado el proceso de participación ciudadana, la Sección 2.8(a) de la Ley Núm. 38-2017, *supra*, requiere que toda agencia que haya aprobado un reglamento lo presente ante el Departamento de Estado. 3 LPRA sec. 9618(a). De igual forma, el precitado artículo dispone que, como regla general, el reglamento comenzará a regir pasados los treinta (30) días desde su radicación, a menos que aplique una de las tres excepciones allí detalladas. Íd.  Así mismo, la Sección 2.8 (d) provee que: "[e]l Secretario [de Estado] publicará en dos (2) periódicos de circulación general una síntesis del contenido de cada reglamento radicado, con expresión de su número, fecha de vigencia y agencia que lo aprobó. Esta publicación se

llevará a efecto dentro de los veinticinco (25) días siguientes a la fecha de su radicación". 3 LPRA sec. 9618(d).

Dicho proceso es imperativo para "cumplir con el requisito de notificación, **elemento indispensable para validar la reglamentación** y concederle virtualidad al principio básico, consignado en el Art. 2 del Código Civil de Puerto Rico, de que la ignorancia de la ley no es excusa para su incumplimiento". Grupo HIMA v. Dept. de Salud, *supra*, pág. 79 (énfasis suplido). En fin, "el propósito de los procedimientos de notificación, participación ciudadana, presentación y publicación es garantizar que a los ciudadanos se les notificará y tendrán una oportunidad de que se consideren sus puntos de vista **antes de adoptar una norma que impacte sus derechos y les imponga obligaciones**". Íd., págs. 79-80 (énfasis suplido). Por consiguiente, "[u]na regla o reglamento aprobado después de la fecha de efectividad de esta Ley será nulo si no cumpliera sustancialmente con las disposiciones de esta Ley". 3 LPRA sec. 9617(a). Asimismo, la Sección 2.7(b) dispone que para impugnar de su faz un reglamento por incumplimiento con las referidas disposiciones, se presentará la causa de acción ante el Tribunal de Apelaciones en un término de treinta (30) días contados a partir de la fecha de vigencia del reglamento. 3 LPRA sec. 9617(b).

**B.**

En lo pertinente al caso de autos, la Comisión de Practicaje de Puerto Rico es una corporación pública creada por virtud de la Ley Núm. 226 de 12 de agosto de 1999, según enmendada, conocida como la "Ley de la Comisión de Practicaje de Puerto Rico", 23 LPRA sec. 361 *et seq.* (en adelante, "Ley Núm. 226 de 1999"), facultada para autorizar, reglamentar, supervisar e imponer sanciones sobre el practicaje, así como para adoptar y **reglamentar el tránsito marítimo**. Art. 5 de la Ley Núm. 226 de 1999, 23 LPRA sec. 361b. De igual forma, el Artículo 26 dispone que "[l]a Comisión tendrá poder para adoptar y promulgar reglas y reglamentos para hacer cumplir esta Ley, incluyendo aquellos cargos necesarios para

financiar el costo administrativo y operacional de la Comisión". 23 LPRA sec. 361 nota.

En vista de ello, el 31 de agosto de 2006, se adoptó el Reglamento Núm. 7214, conocido como las "Reglas de Tránsito en los Puertos de Puerto Rico de 2006" (en adelante, "Reglamento Núm. 7214"),[10] de conformidad con su ley orgánica. Íd. El mismo regula, entre otras cosas, la zona de abordaje en el Puerto de San Juan,[11] la velocidad de las embarcaciones[12] y la dirección del tránsito.[13] En cuanto a esto último, la Regla 38 dispone que el tránsito en los canales de Puerto Nuevo, *Army Terminal* y/o *Gravity Dock*, así como en sus correspondientes *turning basin*, "será en una sola dirección y no se podrá rebasar ni transitar en dirección contraria hasta que el canal esté libre de tránsito".[14]

**III.**

Por estar íntimamente relacionados, discutiremos conjuntamente los señalamientos de error traídos ante nuestra consideración.

En el presente recurso, los Recurrentes alegan que erró la Comisión al no cumplir con los requisitos establecidos en la LPAU, *supra*, al momento de aprobar e implementar las guías de seguridad sugeridas por la SJBP aquí en controversia. Sostienen que las guías impugnadas fueron puestas en vigor de manera inmediata e ilegalmente, ya que la Recurrida es la única que tiene el poder para reglamentar el tránsito marítimo, conforme a la Ley Núm. 266 de 1999, *supra*. Además, arguyen que las guías **añaden requisitos y restricciones** al Reglamento Núm. 7214, *supra*, por lo que este último fue enmendado sin cumplir con las disposiciones establecidas en la LPAU, *supra*, sobre el proceso formal de reglamentación en nuestra jurisdicción.

Por otro lado, la Comisión expuso que no promulgaron una regla o reglamento al adoptar las guías de seguridad, sino que éstas son meramente un documento guía cuyo propósito es informar la discreción de

---

[10] Resolución Núm. 2006-002.
[11] *Véase*, Reglamento Núm. 7214, Sección II, Regla 34.
[12] *Véase*, Reglamento Núm. 7214, Sección II, Regla 35.
[13] *Véase*, Reglamento Núm. 7214, Sección II, Regla 38.
[14] *Véase*, Regla 38 del Reglamento Núm. 7214.

los prácticos al momento de enfrentarse a ciertas condiciones específicas. Añadió que no están facultados para reglamentar la discreción de los prácticos y, en vista de ello, los Recurrentes no pueden alegar que incumplieron con el proceso de reglamentación dispuesto en la Ley Núm. 38-2017, *supra*.

En múltiples ocasiones nuestro máximo foro judicial ha validado el axioma de que "el nombre no hace la cosa". Natal Albelo v. Romero Lugo, 206 DPR 465, 498 (2021); OCS v. CODEPOLA, 202 DPR 842, 880 (2019). Así pues, indistintamente del nombre que se les hubiera otorgado a las guías de seguridad en controversia, nos corresponde determinar su alcance y aplicabilidad para determinar si las mismas son o no reglas legislativas que requieren cumplir con el procedimiento de reglamentación instituido en la LPAU, *supra*.

Del examen detenido y sosegado de las *LNG Vessel Safety Guidelines*, a la luz de la normativa expuesta en el acápite anterior, es incuestionable que nos encontramos ante unas enmiendas al Reglamento Núm. 7214, *supra*. Si bien es cierto que los documentos guías carecen de fuerza de ley y no crean derechos u obligaciones a diferencia de las reglas o reglamentos, no es menos cierto que las reglas legislativas alteran derechos de individuos y/o del público en general, y su aprobación debe ser conforme a los requisitos que establece la LPAU, *supra*, para el proceso de reglamentación, so pena de nulidad.

Para efectos de la Ley Núm. 38-2017, *supra*, la Comisión de Practicaje es una entidad gubernamental facultada, mediante el Artículo 5 de su ley orgánica, para adoptar reglamentos que promuevan y garanticen la **protección del tránsito marítimo en las aguas y puertos de Puerto Rico**. 23 LPRA sec. 361b. Precisamente, ello fue lo que hizo al adoptar las guías de seguridad aquí impugnadas. La Recurrida, mediante éstas, enmendó la Sección II del Reglamento Núm. 7214, *supra*, sin antes cumplir con el proceso de reglamentación dispuesto en la LPAU, *supra*. Dichas medidas fueron adoptadas para garantizar la seguridad para el servicio de practicaje a embarcaciones de más de 22 metros de manga, hasta un

máximo de 32.2 metros de manga, que atracan en Puerto Nuevo A y B, y del lado este del COD, los cuales forman parte del Puerto de San Juan.

Nótese que su adopción por parte de la Comisión se dio porque el espacio entre ambos terminales es uno reducido para la naturaleza de las cargas que manejan las embarcaciones que allí atracan. Por esa consideración especial, han de tener unas precauciones de seguridad actualizadas, las cuales la Comisión entendió razonable atenderlas mediante la adopción de las medidas de seguridad impugnadas por los Recurrentes.[15] Ello, indefectiblemente, constituye una medida de protección del tránsito marítimo en unos puertos de Puerto Rico que precisamente es lo que persigue regular el Reglamento Núm. 7214, *supra*. Así lo establece taxativamente la Regla 3 del aludido cuerpo reglamentario al establecer que sus disposiciones aplicarán:

> [A] los Prácticos y las embarcaciones, incluyendo, entre otras personas, a sus agentes, dueños, operadores, representantes, así como a los operadores o dueños de muelles o facilidades, y los dueños u operadores de remolcadores o embarcaciones para la asistencia en la maniobra de embarcaciones en su transitar por las aguas navegables de Puerto Rico. Regla 3, Reglamento Núm. 7214 de 31 de agosto de 2006, Comisión de Practicaje de Puerto Rico.

Al añadir estas restricciones de cómo, cuándo y bajo qué circunstancias los prácticos podrán atracar en dichos muelles, dependiendo del tipo de embarcación, se enmienda el Reglamento Núm. 7214, *supra*, el cual dispone las reglas de tránsito y establece normas que tienen fuerza de ley para toda persona que ejerza el practicaje en los puertos de Puerto Rico. Entiéndase, se crean requisitos adicionales de aplicación general para todo individuo u ente que lleve a cabo el practicaje en el área del Puerto de San Juan. Contrario a lo argumentado por la Recurrida, entendemos que las guías aquí impugnadas no son una mera expresión de la Comisión para ofrecer claridad al Reglamento, sino que regulan específicamente aspectos del proceso en muelles del Puerto de San Juan.

---

[15] *Véase*, Apéndice del recurso de revisión judicial, págs. 002 y 032.

Por ejemplo, la Regla 14 del Reglamento Núm. 7214, *supra*, establece la cantidad mínima de remolcadores a utilizarse, mientras que la Sección II del precitado Reglamento, Reglas 34 a la 40, establecen todo lo relativo al manejo de embarcaciones en los muelles del Puerto de San Juan, como lo es la dirección del tránsito en los canales de Puerto Nuevo, el *Army Terminal* y sus respectivos *turning basin*, velocidad y abordaje, entre otras. A nuestro juicio, las guías enmiendan el Reglamento Núm. 7214, *supra*, al añadir requisitos restrictivos en cuanto a una situación específica, como lo es la naturaleza de las cargas de las embarcaciones y el tipo de embarcación que atraca en los puertos de Puerto Nuevo A y B, y del lado este del COD, bajo circunstancias particulares. Sobre lo anterior, no podemos perder de perspectiva que la necesidad de implementar dichas normas obedeció a consideraciones de seguridad por el tipo de cargas que se manejan en ambos terminales.

En fin, las guías que aquí enmiendan el Reglamento constituyen la regla general de cómo han de manejarse las embarcaciones que habrán de atracar en los puertos de Puerto Nuevo A y B y al lado este del COD, bajo ciertas circunstancias particulares.  No obstante, así como el mismo Reglamento les concede la discreción a los prácticos para tomar decisiones dependiendo de las situaciones en las que se encuentre, ello también podrá hacerlo en estos casos. Por consiguiente, debido a que lo aprobado en las guías afecta las reglas de tránsito en canales del Puerto de San Juan, y sin su cumplimiento no se le provee el servicio de practicaje, la Comisión tenía que cumplir con las garantías mínimas del proceso de reglamentación dispuesto en la LPAU, *supra*. Somos de la opinión de que las referidas medidas de seguridad implementan unas enmiendas sustantivas al Reglamento Núm. 7214, *supra*.

En otras palabras, para poder adoptar las guías de seguridad y, por ende, correctamente enmendar el Reglamento Núm. 7214, *supra*, la Comisión debió: (1) notificar al público la reglamentación que ha de aprobarse, es decir las guías de seguridad sugeridas por la SJBP; (2) proveer oportunidad para la participación ciudadana, incluyendo vistas

públicas cuando sea necesario u obligatorio; (3) presentar la reglamentación ante el Departamento de Estado para la aprobación correspondiente, y (4) publicar la reglamentación aprobada. FCPR v. ELA et al., *supra*; Mun. de Toa Baja v. D.R.N.A., *supra*, pág. 694; 3 LPRA sec. 9611–9613, 9618 y 9621.[16]

Debido a que la Comisión únicamente adoptó las guías de seguridad con vigencia inmediata y notificó las mismas mediante un Aviso a los usuarios de los canales de Puerto Nuevo A y B, y del COD, incumplió sustancialmente con las Secciones 2.1, 2.2, 2.3 y 2.8 de la Ley Núm. 38-2017, *supra*, y erró al así hacerlo. Por consiguiente, las guías o medidas de seguridad en controversia son nulas por constituir enmiendas al Reglamento Núm. 7214, *supra*, sin haber cumplido con el procedimiento de reglamentación que exige nuestro ordenamiento jurídico.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral de la presente *Sentencia*, declaramos nulas las *LNG Vessel Safety Guidelines* aprobadas por la Comisión de Practicaje de Puerto Rico, por entender que constituyen enmiendas al Reglamento Núm. 7214, *supra*, adoptadas sin cumplir con el procedimiento de reglamentación formal establecido en la Ley Núm. 38-2017, *supra*. Así pues, la Comisión deberá asegurarse de, como requisito previo a su implementación, cumplir con las disposiciones relativas a la notificación, participación, presentación y publicación de reglamentos, entre otras, conforme lo establecido en el Capítulo II de la LPAU, 3 LPRA secs. 9611-9630.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[16] Nada impide que, ante circunstancias particulares, se puedan implementar las aludidas enmiendas mediante el procedimiento de emergencia dispuesto en la Sección 2.13 de la LPAU, 3 LPRA sec. 9623.